WESTERN DISTRICT ARKANSAS
FILED
OCT 0 3 2012
CHRIS R. JOHNSON, CLERK
BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS

DAVID A. STEBBINS                                                    PLAINTIFF

vs.                          Civ. No. 10-5125

UNIVERSITY OF ARKANSAS                                DEFENDANTS

### RESPONSE IN OPPOSITION TO MOTION FOR EXTENSION OF TIME

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following response in opposition to Defendant's Motion for Extension of Time to Respond to my Motion for Summary Judgment.

Defendant claims that it needs this extension because information obtained in my deposition will potentially be relevant to the Summary Judgment. However, they have failed to qualify this answer with anything specific. Specifically, what information do they expect to get? If they cannot provide anything specific, then they are merely stalling for time, and their motion should be denied accordingly. See Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 US 574, 586 (1986) ("[T]he issue of fact must be 'genuine.' When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Internal citations omitted.). Unless they have a tangible plan, then the Court should not delay my justice simply on the off chance that it can be useful to them.

For that matter, why do they suddenly *need* the deposition? When moving for leave to take my deposition beyond the discovery cut-off date, they specifically said that it's okay if the Court *doesn't* grant that leave, because they already have enough evidence to support summary judgment in their favor.

The only explanation I can think of for this sudden change of mindset is that, when I filed

the motion for summary judgment, I gave a legal argument that they did not anticipate: That, without reasonable accommodations first being exhausted, there is no direct threat.

However, if that is what they intend to depose me about, they still should not be granted this leave. Why not? Because they *did* anticipate this legal argument! See Exhibit A, an email, dated October 30, 2010, sent to Luitenant Vance Rice, who, at the time, was serving as liaison between myself and other UA staff. As you can see, I explained to them the fallacy behind their legal logic that direct threat = on-the-spot expulsion.

They chose to spend their entire discovery focused on proving that I was a direct threat. However, they had been informed, long before the discovery actually began, that there is more to the direct threat exception than *just* proving that I'm a safety risk.

However, because they were notified of this legal nuance well in advance, it is entirely their fault for not making discovery on it beforehand, and they should reep the consequences accordingly.

Therefore, the motion for extension of time to respond to my motion for summary judgment should be denied.

*David Stebbins* (signature)
David Stebbins
123 W. Ridge St.,
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com

Exh. A

**Subject:** One chance to explain to you why you are in BIG trouble!
**From:** David Stebbins (stebbinsd@yahoo.com)
**To:** marvinr@uark.edu;
**Date:** Saturday, June 26, 2010 1:51 AM

Vance Rice,

It is my understanding that you are continuing with your discrimination against me because you think that it's illegal. I am writing to take one opportunity (and only one) to explain to you where you went wrong, so that maybe, just maybe, you will offer to settle out of court.

Vance, you might want to read this, yourself. You, in your individual capacity, are also getting sued because you carried out the order to ban me from campus, which makes you an accomplice. I don't want you to just forward this email to your employer. I want you to print it out and physically put it in his hand, and I want a response telling me their answer.

Allow me to establish the law, here. Your legal department can probably vouch for this.

As I've already said, the US Code, Title 42, Section 2000d-7 explicitly states that the government does not have sovereign immunity when sued in federal court for discrimination.

Section 504 of the Rehabilitation Act clearly calls for reasonable accommodations for disabilities.

The new discrimination is not original discrimination, in and of itself, but it IS the decision to uphold the original discrimination. Therefore, if the original discrimination was in violation of Section 504 of the Rehabilitation Act, it is illegal for you to uphold the discrimination.

The Rehabilitation Act does, indeed, exempt "direct threats" from discrimination; however it defines a "direct threat" as "a significant risk to the health or safety of others **that cannot be eliminated by reasonable accommodation.**" You have to *accommodate* the disability!

The Eggshell Skull Doctrine states that, if the victim of a tort is in a delicate situation prior to the tort, and he suffers a much bigger injury than normal people would in that situation, but for the delicate vulnerability to injury, then that's just tough for the defendants. When I sue you for $300,000,000 (yes, that is not a typo; three hundred MILLION dollars), you will end up having to sell about a third of your property to pay for it.

As a government entity, I have first amendment rights that you have to respect. I understand the concept of "fighting words," but keep in mind that the case of Street v. New York has *explicitly* said that mere offensiveness does not, alone, constitute fighting words. In fact, Chaplinsky v. New Hampshire (the case where the fighting words doctrine was first invented) was passed in 1947! Back then, it was taboo to even show a bathroom on television because two of the three facilities normally associated with a bathroom involved the removal of pants! Honestly, the "fighting words" that Chaplinsky got arrested for were "You're a damned racketeer!" Really? THOSE are fighting words? Not in the twenty-first century, they're not!

Therefore, in order to successfully claim that my email to Gearhart was not constitutionally protected, you'll have to prove an actual injury beyond mere hurt feelings. Since the punishment was targeted at the content of the speech (specifically, the curse words), rather than the time, place and manner of the speech (such as over email or standing outside Yocum Hall), this rule will be subjected to strict scrutiny, which will be hard as hell for you to overcome.

Now that I've gotten the law out of the way, allow me to explain to you the facts of the situation.

The original reason for you expelling me was because I had made a "threat." Allegedly, without my medications, I become angry and violent. Well, as I have already established, you have to accommodate the disability in order to quell the direct threat. If you want an example of a reasonable accommodation, how about giving me access to those medications? How 'bout that!

Simply put, the decision of whether or not to expel me was *not* your decision to make! Why was I entitled to continue with my studies? Because it's the law, period. You had no business even kicking me off campus in the *interim*! That, alone, was discrimination!

When I contacted Gearhart and demanded that he revoke the discrimination on the spot, he didn't have the option of saying no. Because he refused to obey the law, as established above, he committed a brand new act of discrimination.

The email that I sent him was constitutionally protected. As a direct result, he had no business retaliating against it at all, much less banning me from campus for a year.

Gearhart may have given the order for me to be banned, but you (Vance Rice) obeyed the order. That makes you an accomplice to this discrimination, which means I can also go after you, in your individual capacity, to collect on this judgment. Imagine if I file for creditor-induced Chapter 7 bankruptcy against Vance Rice! You know your house, that house that you worked all your life to pay off? GONE! Gearhart's house that he worked all his life to pay off, GONE! Your car, GONE! Almost all of your furniture, GONE! Your entire life savings, GONE! You will both be left with crumbs on the floor! And, even then, I will take a good amount of property from the UA campus (remember, you don't have sovereign immunity, so you won't be able to protect it like that).

Now, here's where it starts to get good. Remember that three hundred million I mentioned, earlier? Well, that's actually from a loss of reputation.

This loss of reputation is directly caused, not by the discrimination itself, but by forcing me to publicly sue you to address this grievance, rather than settling it between us, like you should have done.

See, I had ambitions. I had ambitions to start my own professional wrestling promotion. However, I can show proof that the wrestling business will hold a grudge against me for "suing my way to the top" like this, and would not give me their business. As a direct result, the loss of reputation that you have caused me is worth all of those lost profits. Do you know what those lost profits are?

Well, according to my business plan, they amount to about ten million dollars per year (I was planning on starting at age 40, and retiring at age 70, when my IRA was ready, for a total of thirty years). Yes, I understand that I can just "get another job;" I've already accommodated for that. This ten million is actually the *difference* in the running of this business, and any other "job."

Now, I understand the concept of "speculative damages." Courts don't just award mere "pipe dreams." You have to prove that the speculation is reasonably likely to occur.

Well, tell me, is it "mere pipe dreams" that that ten million in yearly profits come directly from only one type of revenue (which, because of my streamlined business plan, would amount to about a fifth – yes, a FIFTH – of what competitors are getting in that revenue department), doubling the prices of necessary equipment from the price of today (amounting for inflation), and only get 51% of the profits due to him having to sell the remaining 49% in stocks (100 shares apiece to ensure that it's an S Corporation), yet still

allocating funds to pay the start-up debts, even though he would not have stockholders AND start-up debts at the same time?

So, I am increasing his costs unnecessarily, and reducing my revenues to an unrealistic point, paying my employees generously to reduce employee turnover, and even give nearly half the profits away to stockholders, yet still pay off a loan which having shareholders would negate, and yet, I STILL come up with ten million dollars of profit a year that I, myself, get to pocket.

Is that "mere pipe dreams?" On the contrary, if it were NOT reasonably likely to occur, why is it that I posted this plan on *numerous* message boards and actually asked them to poke holes in the plan, and they couldn't do it? They couldn't poke ONE hole in the plan that was not the result of a straw man argument (straw man: a logical fallacy based on a misunderstanding of the other person's perspective).

So, there you have it. I will call you on Monday morning and ask you for your answer to this.

Sincerely,

David Stebbins